## 37282. STRICKLAND v. PHILLIPS PETROLEUM COMPANY.

SMITH, Justice.

Appellee Phillips Petroleum appealed a motor fuel tax assessment of $50,884.33 to the Superior Court of DeKalb County. The parties entered into a stipulation of facts and made cross-motions for summary judgment. The court invalidated the assessment as well as Revenue Regulation 560-9-2-.06 (Rules and Regulations of the State of Georgia, January 1, 1979 (Revised)) "insofar as it fails to permit a distributor to receive credit or allowance for losses resulting from ordinary shrinkage and evaporation . . ."

The stipulated facts are as follows: Appellee is a fuel distributor. See Code Ann. §§ 92-1403 (J), 1403 (A)[1]. Its products are refined outside the state of Georgia and are pumped through pipelines owned by Colonial Pipeline Company. There are two fuel terminals in this state, one at Doraville, the other at Albany. Colonial operates fuel meters located near each terminal and Phillips is billed on the basis of readings taken from these meters. Phillips reports the readings to the State Revenue Department each month.

There are no meters measuring fuel input at either of Phillips' Georgia terminals. However, Phillips does have visual gauges on the outside of its storage tanks which "work on the principal of a calibrated 'dipstick.' " The gauges enable Phillips to monitor the amount of product in each storage tank. The gauge measurements serve as a check on Colonial's meters and provide figures on closing (and beginning) inventory.

In addition to these meters, Phillips operates meters which measure the quantity of fuel sold or redistributed. "During the entire assessment period, said meters were locked and sealed except at such times proving and maintenance was necessary, and there is no evidence that the meters were tampered with to cause motor fuel to by-pass them. Phillips has reported to the Georgia Department of Revenue, Motor Fuel Tax Division all motor fuel and kerosene which such meters showed as having been withdrawn from its storage tanks in Georgia and has paid all applicable Georgia motor fuel taxes as determined thereby."

"During each month of the assessment period certain variations occurred between the amount which Phillips' meters showed as

---

[1] Unless otherwise indicated, references to Code provisions in this opinion are to those in effect during the assessment period (January, 1973-December, 1975). Ga. L. 1978, p. 186, 214 provides that "[r]epeal of Chapter 92-14 by this Act . . . shall not affect . . . any . . . action or proceedings commenced under such Laws . . ."

having been withdrawn from storage in Georgia and the amount computed to have been withdrawn by subtracting the closing inventory of the month from the sum of the month's opening inventory plus receipts. In some months, there was an overage resulting from such computation, and in some months a shortage. Variations of this nature are common to terminal facilities. It would be uncommon for no variations to occur, and, recognizing this fact, the Georgia Revenue Department's monthly Motor Fuel Tax Report form provides a line requiring distributors to show 'over' or 'short' variations each month." The assessment at issue in the instant case arises out of an aggregate shortage for the assessment period of 582,750 gallons.

Some of this shortage is the result of evaporation, which unavoidably occurs during storage and distribution. There is no evidence of theft, nor is there any evidence of tampering with Phillips' monitoring equipment. Company records appear accurate. There is no indication "that Phillips withdrew from storage for consumption in its own motor vehicles, more motor fuel than the amount . . . reported as having been so withdrawn and consumed."

"During the assessment period, Phillips, pursuant to Ga. Code Ann. § 92-1407 (c), took an allowance of one per cent of the first five and one-half cents per gallon of all State motor fuel tax it paid to cover losses and expenses incurred in collecting the tax for the State. The statutory allowance taken by Phillips during the assessment period amounted to $62,601.22 or, in terms of volume of fuel on which no motor fuel tax was paid, 834,683 gallons."

1. Code Ann. § 92-1403 imposes an excise tax "upon the sale or use of motor fuel by . . . distributors." Code Ann. § 92-1402 (I) provides: " 'Sale' shall mean and include any exchange, gift or other disposition . . ." Appellant revenue commissioner argues that the "unaccounted for losses" of motor fuel constitute an "other disposition" and thus may be treated as a sale. The court below rejected this argument, and so do we.

The position advanced by the department appears contrary not only to Code Ann. § 92-1403 (f), which provides that "[t]he taxes imposed by this Chapter . . . shall not be construed to apply to the storage, withdrawal, compounding, blending *or other handling of . . . motor fuel preliminary or preparatory to . . . sale or use*" (emphasis supplied), but also contrary to Op. Atty. Gen. 66-152 (1966) which states: "The legal maxim 'noscitur a sociis' means generally that a word or phrase may be known from its accompanying terms. Under this rule, words of general import, when associated together with other words of more specific import, are limited in a sense analogous to the more specific phrases.

"In the definition of 'sale' as contained in Ga. Code Ann. § 92-1402 (I) of the 'Motor-Fuel Tax Law,' the phrase 'or other disposition,' being a phrase of general import, should be restricted to a sense analogous to the more specific words 'exchange,' 'gift,' and 'accquisition of ownership.' The other more specific phrases contemplate a transfer of ownership. The phrase 'or other disposition' should also be limited to situations where ownership is transferred and, therefore, a casualty loss en route (such as by fire or spillage) would not fall within the definition of 'sale' as defined in Ga. Code Ann. § 92-1402 (I) . . ." The term "other disposition" clearly contemplates some affirmative action with regard to the product. Neither a casualty loss nor ordinary shrinkage is an "other disposition" within the meaning of Code Ann. § 92-1402 (I). See *Thompson v. Eastern Air Lines,* 200 Ga. 216 (39 SE2d 225) (1946); see also *Conley v. State,* 85 Ga. 348 (11) (11 SE 659) (1890); *Barnard v. Barnard,* 91 Ga. App. 502 (86 SE2d 533) (1955).

2. Although the motor fuel tax is a tax on "sale or use," the revenue department monitors the aggregate shortage of fuel in order to effectively audit oil company returns. The parties agree that, if ordinary losses go beyond an acceptable standard, they may be deemed a sale unless the distributor can show that the loss actually occurred. They disagree on where this acceptable standard is to be found.

The revenue department takes the position that the standard for acceptable losses is set forth in Code Ann. § 92-1407 (C). Revenue Regulation 560-9-2-.06 provides: "Losses of motor fuel over and above that compensated for by the statute shall be allowed only where the losses occur prior to the accrual of the tax and only after prior approval by the State Revenue Commissioner. To be approved, losses must be supported by properly executed affidavits and such other evidence as required by the State Revenue Commissioner and will be allowed only for fuel owned by and in possession of the distributor claiming the loss." Under this regulation, the aggregate shortage is counted as a taxable sale. The distributor is then given a credit to cover ordinary losses. If losses exceed the statutory allowance, the distributor is required to make an evidentiary showing in order to obtain additional credit.

Phillips argues that the standard for acceptable loss is not set forth in the statute and, thus, can only be established by departmental regulation. This view is consistent with the practice of the revenue department from 1945 to 1972.[2]

---

[2] Former Revenue Regulation 560-9-2-.06 provided: "(1) Extraordinary losses by

The court below invalidated Regulation 560-9-2-.06. We therefore must determine whether the allowance provided in Code Ann. § 92-1407 (C) was intended to serve the function advanced by the department. If it was, we must also determine the extent to which losses are "compensated for by the statute."

These issues are not unrelated. If the amount of compensation for ordinary losses cannot be determined from the statute, the statute obviously was not intended to serve the function contemplated by Revenue Regulation 560-9-2-.06.

Code Ann. § 92-1407 (C) provides: "At the time of rendering [the monthly] report, the distributor shall pay to the Revenue Commissioner the tax or taxes imposed by this Chapter on all motor fuel and/or kerosene sold or used in this State during the next preceding calendar month less an allowance of one per cent. of the first five and one-half cents per gallon of State tax paid to cover losses and expenses incurred in collecting the tax for the State: Provided, this allowance shall not be deductible unless payment of tax is made on or before the 20th day of the month as herein required."

The department concedes that, prior to 1972, the dual nature of the statutory allowance prevented a determination of compensation for losses. It argues, however, that a 1971 amendment to Code Ann. § 92-1403 (C), providing that "[i]t is the intention of the General Assembly that the legal incidence of taxes imposed under this Chapter be and is imposed on the distributor," placed the motor fuel tax directly on distributors and thereby eliminated any "expenses incurred in collecting the tax for the State." "At this point," the department contends, "it became crystal clear that every penny which distributors received under the statutory allowance provided by § 92-1407 (C) for 'losses and expenses incurred in collecting the tax for the state' went toward compensating the distributor for losses alone."

While we must agree with department's assertion that, after the 1971 amendment, distributors no longer incurred expense in "collecting the tax [as agent] for the state," we nonetheless find its reasoning unpersuasive. The 1971 legislation was not enacted for the

---

distributors which occur prior to the accrual of the motor fuel tax will have to be supported by properly executed affidavits and must be supported by such other evidence as required by the State Revenue Commissioner before the motor fuel thus lost can be allowed as a credit on the motor fuel tax report of the distributor involved. No such losses will be allowed unless approved by the State Revenue Commissioner.

"(2) Distributors claiming such losses resulting from ordinary shrinkage and evaporation will only be allowed the actual loss which in no case is to exceed one-half of one per cent of the amount of motor fuel to be accounted for."

purpose of making Code Ann. § 92-1407 (C) a more precise statute. The fact that, after 1971, no expenses were actually incurred by distributors in collecting the tax for the state does not mean that the legislature intended to eliminate what had previously been treated as a tax benefit. We note, in addition, that the newfound precision of Code Ann. § 92-1407 (C) was short-lived. Code Ann. § 91A-5008(b) (Ga. L. 1979, pp. 5, 92) provides the distributor an allowance "of one percent of the first five and one-half cents per gallon of the State tax paid to cover losses *and expenses incurred in reporting* the tax to the State." (Emphasis supplied.) Under this formulation it is impossible to determine the extent to which "losses [alone are] compensated by statute."

We hold that Code Ann. § 92-1407 (C) was not intended to serve the function contemplated by Revenue Regulation 560-9-2-.06. As the regulation is inconsistent with the statute, the court below did not err in invalidating it. See *Ga. Real Estate Comm. v. Accelerated Courses in Real Estate, Inc.,* 234 Ga. 30, 32 (214 SE2d 495) (1975); *State of Ga. v. Camp,* 189 Ga. 209 (6 SE2d 299) (1939).

3. The "unaccounted for losses" at issue in this case are not, in fact, "unaccounted for." The department admits that a large portion of the aggregate shortage was due to ordinary shrinkage and evaporation. There is no evidence of any improper activity on the part of the oil company, and the losses appear to be well within industry standards. Under these circumstances, it would appear that the proposed assessment is excessive.

The assessment, however, should not have been invalidated in its entirety. Phillips has admitted that, due to a miscalibration of the "prover" tank at the Doraville facility, it paid motor fuel tax on 755 gallons for every 755.5 gallons pumped from the terminal. As it is uncontroverted that, "[d]uring the assessment period, Phillips reported taxable sales and uses of motor fuel pumped from its Doraville terminal totaling 47,963,230 gallons," the assessment must be upheld in the amount of $2,382.23 plus interest. To this extent, the judgment is reversed.

The judgment is affirmed insofar as it invalidates the remainder of the current proposed assessment. Our holding does not prohibit the department from imposing a new assessment in the event Phillips has not met the standards imposed by a valid substitute regulation.

*Judgment affirmed in part; reversed in part. All the Justices concur, except Weltner, J., not participating.*

DECIDED NOVEMBER 13, 1981 —
REHEARING DENIED DECEMBER 3, 1981.

Arthur K. Bolton, Attorney General, John E. Bumgartner, Assistant Attorney General, for appellant.
Heyman & Sizemore, W. Dan Greer, for appellee.