**FIRST DIVISION
BARNES, P. J.,
GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 30, 2021**

# In the Court of Appeals of Georgia

A21A0311. CAJUN CONTRACTORS, INC. v. PEACHTREE PROPERTY SUB, LLC et al.

A21A1120. CAJUN CONTRACTORS, INC. v. LAGUERRE et al.

BARNES, Presiding Judge.

Max Laguerre was injured by a metal pipe that fell from a construction site located on the roof of a hotel. Laguerre settled his negligence claims against the entities that owned and managed the hotel, Peachtree Property Sub, LLC, d/b/a Crowne Plaza Hotel Atlanta-Midtown, FO Peachtree Property, LLC, d/b/a Crowne Plaza Hotel Atlanta-Midtown, and AWH Partners, LLC, d/b/a Crowne Plaza Hotel Atlanta-Midtown (collectively, the "Hotel Defendants"). A trial thereafter ensued on Laguerre's negligence claims against the general contractor for the construction project, Cajun Contractors, Inc., and the jury awarded Laguerre compensatory and punitive damages and apportioned 100 percent of the fault to Cajun. The trial court

subsequently awarded attorney fees to Laguerre under OCGA § 9-11-68 based on Cajun's pre-trial rejection of his offer to settle. Additionally, the trial court granted summary judgment in favor of the Hotel Defendants on their cross-claims for contractual indemnification against Cajun. These companion appeals followed.

In Case No. A21A1120, Cajun appeals from the final judgment entered on the jury verdict, contending that the trial court erred in denying its motions for directed verdict, for judgment notwithstanding the verdict ("JNOV"), and for a new trial, and that the trial court erred in its award of attorney fees to Laguerre. In Case No. A21A0311, Cajun appeals the trial court's order granting summary judgment in favor of the Hotel Defendants on their contractual indemnification cross-claims. For the reasons discussed more fully below, we affirm in Case No. A21A1120 but reverse in Case No. A21A0311.

*Case No. A21A1120*

Following a jury verdict, we view the evidence in the light most favorable to the prevailing party. *Norton v. Holcomb*, 299 Ga. App. 207, 208 (682 SE2d 336) (2009). So viewed, the evidence shows that in March 2015, Cajun entered into a contract to perform renovation work at the Crowne Plaza Atlanta – Midtown Hotel, which was owned and managed by the Hotel Defendants (the "Trade Contract").

2

Under the Trade Contract, Cajun agreed to supervise the work done on the renovation project and to be liable for any loss or damage to the property or injuries to persons caused by the action or neglect of its employees, subcontractors, or consultants. Cajun also agreed to "keep the premises and the surrounding area free from accumulation of waste materials or rubbish caused by operations under the [Trade] Contract," and to "take all reasonable actions needed to provide clean, unencumbered, well defined, and safe access to the Owner's facilities for vehicles, guests, visitors, and employees."

The renovation project was later expanded through a change-work order to include renovations to the outside pool deck located on the roof of the hotel.[1] As part of the renovation, Cajun was to demolish cabanas and a wall along the edge of the hotel roof. Cajun hired RYR Construction, LLC[2] to perform some of the renovation work at the hotel, including the painting of a ballroom and the pool deck renovation. With respect to the pool deck renovation, workers for RYR considered Troy Bossier, the president of Cajun, to be their boss on the job, and he was at the work site

---

[1] The terms of the Trade Contract applied to change-work orders.

[2] RYR Construction is sometimes referred to as "R&R" Construction in the record, but for ease of reference, we will refer to the company as RYR. The difference in name is not material to this appeal.

everyday and controlled the demolition work done in the pool area. No decisions were made about the work done on the roof without first talking to Bossier, who would come to the pool deck and direct RYR workers "as to what part of the project they should be doing." Cajun provided tools and equipment to RYR, told RYR what hours it could work on the pool deck, devised the plan for demolishing the rooftop wall and the sequence in which the work should be performed, and controlled the work site and work flow.

Before the work on the pool renovation commenced, Cajun did not develop a public hazard control plan or a site-specific safety plan, have any safety meetings with RYR, or inform RYR of any safety rules. Cajun simply told RYR to ensure that nothing fell from the roof, even though RYR had no prior experience performing exterior demolition work. No barriers, catch platforms, enclosures, or perimeter debris netting were installed to protect the public from hazards from the rooftop construction site. No signs were placed outside the hotel to warn that there was construction overhead, and no portion of the sidewalk below was blocked off with barricades. Nor was any effort made to relocate the hotel taxi stand, which was in the front of the hotel below the elevated construction site.

4

On July 20, 2015, RYR was demolishing part of the wall along the side of the hotel roof, which caused the cabanas to shake. As a result of the shaking caused by the demolition work, an unsecured eight-foot metal pipe fell from the roof of one of the cabanas down the side of the hotel and struck Laguerre, a taxi cab driver, who was standing outside of his cab at the hotel taxi stand.[3] As a result of the impact, Laguerre suffered a broken nose and injuries to his arm, face, head, and wrist, and he was diagnosed with a "mild traumatic brain injury." Prior to the incident, RYR had not inspected the pool cabana roofs, even though one of RYR's partners who worked on the project acknowledged that he knew that there was a danger of objects or debris falling from the hotel roof as a result of the demolition work, and even though Cajun had provided ladders to RYR so that workers could see and reach the top of the cabanas. Nor did Cajun ever direct RYR to conduct such an inspection as part of the demolition plan that Cajun developed, and Cajun disavowed any responsibility to itself conduct a safety inspection.

---

[3] There was testimony at trial that the pipe was a conduit for containing electrical wiring, and that there were electrical subcontractors hired by Cajun working on the pool renovation. There was other, conflicting testimony that the pipe could have been placed on the cabana roof by a hotel employee.

In April 2017, Laguerre filed suit against the Hotel Defendants and Cajun.[4] Laguerre's complaint alleged, among other things, that Cajun breached its duty of reasonable care by negligently failing to implement safety precautions for the pool renovation project and by negligently training, supervising, and retaining those who worked on the project. The complaint further alleged that Cajun was vicariously liable under respondeat superior and agency principles for the negligence of RYR in failing to secure the construction site from the risk of falling objects. Laguerre sought compensatory damages and later amended his complaint to seek punitive damages.

Shortly before trial, the Hotel Defendants reached a settlement with Laguerre.[5] In the ensuing jury trial between Laguerre and Cajun, AWH Partners, which was the Hotel Defendant that hired Cajun and communicated with Bossier about the pool renovations, remained on the special verdict form for apportionment purposes. Following the close of evidence in the liability phase of the trial, the jury returned a verdict in favor of Laguerre and against Cajun, awarding Laguerre $5,000,000 in compensatory damages and finding that Laguerre was entitled to recover punitive

---

[4] Other defendants were later dismissed from the case with prejudice.

[5] Based on a stipulation by the parties, Laguerre's claims against the Hotel Defendants subsequently were dismissed with prejudice.

6

damages. On the special verdict form, the jury found that the employees of RYR were employees of Cajun such that Cajun was vicariously liable for the negligence of RYR. The jury apportioned 100 percent of the fault to Cajun and no fault to AWH Partners. After a second phase of the trial addressing the amount of punitive damages, the jury awarded $500,336 in punitive damages to Laguerre.

The trial court entered judgment in favor of Laguerre and against Cajun in the amount of $5,250,000, representing the jury's award of compensatory damages of $5,000,000 and a statutorily capped $250,000 for punitive damages. See OCGA § 51-12-5.1 (g). Cajun moved for JNOV and for a new trial,[6] and the trial court denied the motions following a hearing on the matter. Laguerre moved for attorney fees under OCGA § 9-11-68 based on a prior offer of settlement he made to Cajun that had been rejected, and he submitted affidavits from his trial counsel and an expert in support of his motion. After a hearing, the trial court awarded Laguerre $1,050,000 in attorney fees and $45,196.47 in litigation expenses.

1. Cajun contends that the trial court erred in denying its motions for directed verdict, for JNOV, and for a new trial.

---

[6] Cajun had previously moved for a directed verdict during the trial, and the trial court had denied the motion.

7

> Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion for directed verdict, new trial and JNOV will not be disturbed.

(Citation and punctuation omitted.) *Mosaic Business Advisory Svcs. v. Stone*, 336 Ga. App. 28, 28 (784 SE2d 426) (2016). Guided by this standard of review, we turn to Cajun's specific arguments.

(a) Cajun argues that it was entitled to a directed verdict on the issue of its vicarious liability for the negligence of RYR. According to Cajun, there was no evidence presented at trial to support a finding by the jury that the employees of RYR were acting as employees of Cajun in carrying out the pool deck renovation. Rather, Cajun maintains, the evidence demanded a finding that RYR acted as an independent contractor such that Cajun could not be held vicariously liable for RYR's negligence. We disagree.

"A person who engages an independent contractor is generally not responsible for any torts committed by the independent contractor." (Citations, punctuation, and footnotes omitted.) *Whatley v. Sharma*, 291 Ga. App. 228, 229 (661 SE2d 590) (2008). See OCGA § 51-2-4 ("An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer."). But "[a]n employer is liable for the negligence of a contractor[ ] . . . [i]f the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant." OCGA § 51-2-5 (5). Whether the relationship is one of employer / employee or employer / independent contractor "is generally a question of fact to be decided by a jury." *Slater v. Canal Wood Corp.*, 178 Ga. App. 877, 878 (1) (345 SE2d 71) (1986).

> Under longstanding Georgia law, the true test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and [employee], or employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract. The right to

9

control the time means the employer has assumed the right to control the person's actual hours of work. The right to control the manner and method means the employer has assumed the right to tell the person how to perform all details of the job, including the tools he should use and the procedures he should follow.

(Citations and punctuation omitted.) *Stalwart Films LLC v. Bernecker*, __ Ga. App. __, __ (1) (855 SE2d 120) (2021). See *RBF Holding Co. v. Williamson*, 260 Ga. 526, 526 (397 SE2d 440) (1990); *Golosh v. Cherokee Cab Co.*, 226 Ga. 636, 637-638 (176 SE2d 925) (1970). An employer / employee relationship will not arise where the employer "has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." (Citations and punctuation omitted.) *Slater*, 178 Ga. App. at 880 (1). Rather, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." (Citations and punctuation omitted.) Id.

Here, there was evidence that Cajun, through its owner Bossier, exercised the right to control the time, manner, and method in which RYR performed the pool renovation. At trial, Laguerre introduced into evidence and read to the jury the Rule

30 (b) (6)[7] deposition testimony of RYR's company representatives, Jose Munoz and Rafael Munoz. Jose Munoz, who worked on the pool renovation at the hotel, testified in his deposition that Bossier was "on-site everyday"; was RYR's "boss on the job"; provided tools for the job; "came up with the plan on how to demolish the [pool deck] wall" and controlled the demolition; told RYR in what sequence the demolition work should be performed; directed RYR's workers on the pool deck "as to what part of the project they should be doing"; and inspected the work performed by RYR's workers and corrected them if they were doing anything inconsistent with his directives. Rafael Munoz, RYR's chief operating officer, testified in his deposition that Bossier instructed RYR as to what should be done each day at the work site, that RYR made no decisions "about the work on the roof without talking to [Bossier] about it," and that Bossier would direct RYR about "the way . . . to perform" the renovation work. Additionally, in his videotaped deposition testimony as a Rule 30 (b) (6) representative for Cajun that was admitted at trial and played for the jury, Bossier acknowledged that Cajun "controlled the work site and the work flow," and in his live trial testimony, Bossier testified that he told RYR when to start and stop working on the pool renovation so that hotel guests could still use the pool.

---

[7] See OCGA § 9-11-30 (b) (6).

11

This combined testimony, construed in the light most favor to Laguerre, created a jury issue as to whether Cajun controlled the time, manner, and method of RYR's execution of the pool deck renovation. See *Atkins v. MRP Park Lake*, 301 Ga. App. 275, 280 (1) (b) (687 SE2d 215) (2009) (concluding that there was evidence that construction workers at apartment complex were acting as employees of apartment management company, where project manager, who was employed by the management company, told the workers when to arrive at work each day, instructed them on a daily basis what tasks to do, regularly gave them direction in performing their work, and where, in performing some of the work, the workers used construction equipment available on the premises rather than their own equipment). Compare *Whatley*, 291 Ga. App. at 230 (no evidence that homeowner was employer of tree-cutting contractor, where homeowner did not provide the contractor with any tools or equipment and "gave no instructions on how to take down the trees but rather (in the words of the contractor) gave him 'freelance' to cut down the trees as he saw best"). While there was other testimony from Bossier, Jose Munoz, and Rafael Munoz from which the jury could have found that Cajun did not assume control over the time, manner, and method of RYR's renovation work, "[t]he jury [was] entitled to believe a part of the testimony of a witness and disbelieve other parts," and thus could

choose which testimony of the witnesses to credit. (Citation and punctuation omitted.) *Cham v. ECI Mgmt. Corp.*, __ Ga. __, __ (3) (856 SE2d 267) (2021). See *Montgomery v. Barrow*, 286 Ga. 896, 899 (1) (692 SE2d 351) (2010) (noting that "it is a jury's prerogative to accept or reject, in whole or in part, the evidence submitted"); *Kirk & Assoc. v. McClellan*, 214 Ga. App. 685, 688 (2) (448 SE2d 764) (1994) (concluding in automobile collision case that "[a]lthough there was evidence presented from which it could be concluded that [the driver hired by the defendant private detective business] was an independent contractor, there was a conflict and [the business] was not entitled to a directed verdict on the issue").

Additionally,

> where one is employed generally to perform certain services for another, and there is no specific contract to do a certain piece of work according to specifications for a stipulated sum, it is inferable that the employer has retained the right to control the manner, method and means of the performance of the contract, and that the employee is not an independent contractor. The test is not whether the employer *did in fact control* and direct the employee in the work, but it is whether the employer had that right under the employment contract.

(Citations and punctuation omitted; emphasis in original.) *Atkins*, 301 Ga. App. at 280 (1) (b). The evidence showed that Cajun hired RYR to work on several parts of the

13

renovation project at the hotel. The evidence further reflected that Cajun and RYR did not enter into a written contract for the pool renovation. There also was some evidence from which the jury could find that Cajun simply paid RYR "every time [it did] something" on the pool renovation, as related by RYR principal Rafael Munoz, rather than pursuant to a specific contract "setting forth specifications as to the work to be performed[ ] . . . [for] a stipulated sum." *Atkins*, 301 Ga. App. at 280 (1) (b). "Given the absence of any such contract in this case, combined with the evidence that [Cajun] retained at least some right to control and direct [RYR], there was a question of fact . . . on the issue of the employment relationship between [Cajun] and [RYR]." *Broadnax v. Daniel Custom Constr.*, 315 Ga. App. 291, 296 (1) (726 SE2d 770) (2012). See *Atkins*, 301 Ga. App. at 280 (1) (b) (concluding that the absence of oral or written contract "outlin[ing] [the construction workers'] precise responsibilities," setting out the "specifications as to the work to be performed," or "identify[ing] a stipulated sum," particularly when "[c]ombined with the evidence of [the apartment management company's] controlling and directing [of the construction] workers, . . . precluded the entry of . . . judgment on the issue" of whether an employer / employee relationship existed); *Atlanta Commercial Builders v. Polinsky*, 148 Ga. App. 181, 183-184 (2) (250 SE2d 781) (1978) (concluding that evidence was

14

sufficient to support finding of employer / employee relationship between general contractor and company of block masons at construction site, where "there was no written contract establishing specifications for the work, but only an oral agreement to pay the masons one dollar per block laid"; the general contractor's superintendent "gave instructions to the head of the mason crew on how the block was to be laid and on one occasion instructed the crew to switch to another job at another location"; and "[t]he masons' boss stated that he was at all times prepared to follow any instructions which the . . . superintendent might give him concerning how the work was to be done").[8] Accordingly, the trial court committed no error in denying Cajun's motion for a directed verdict and for JNOV on the issue of whether Cajun could be held vicariously liable for RYR's acts and omissions based on an employer / employee relationship. See id.

_____

[8] Cajun relies on *Kimble v. BHM Constr. Co.*, 193 Ga. App. 441 (388 SE2d 40) (1989), but that case is distinguishable because the evidence showed that the defendant construction company and carpenter entered into a specific contract for the carpenter "to frame the house for a set price based on the specifications provided by [the construction company]," the construction company did not provide the carpenter with any tools or equipment, and the company "did not have the right to direct [the carpenter's] work on a step-by-step basis." Id. at 442. Here, in contrast, there was no such contract, and there was evidence that Cajun provided tools and equipment to RYR, developed the specific plan for demolishing the pool deck, and directed RYR's on a daily basis on how to carry out the demolition work, as previously discussed.

15

(b) Cajun argues that it is entitled to a new trial because Laguerre failed to establish that Cajun or RYR's conduct proximately caused his injuries. Specifically, Cajun contends that it was not reasonably foreseeable that someone would place a loose metal pipe on top of a cabana. Again, we disagree.

"In order to recover for any injuries resulting from the breach of a duty, there must be evidence that the injuries were proximately caused by the breach of the duty." (Citations and punctuation omitted.) *Tyner v. Matta-Troncoso*, 305 Ga. 480, 485 (3) (826 SE2d 100) (2019). The "hallmark of proximate cause" is reasonable foreseeability. Id. at 488 (3). When addressing issues of foreseeability, we remain mindful that "questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." (Citation and punctuation omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 687 (2) (572 SE2d 533) (2002).

Here, there was evidence that RYR did not inspect the cabanas before commencing the pool demolition work on the hotel roof, and that Cajun never directed RYR to conduct such an inspection and disavowed any responsibility to conduct any safety inspection itself. And, one foreseeable result of demolishing the cabanas and wall on the hotel roof – without first inspecting the cabanas and other

16

rooftop structures and securing or removing detached items discovered in the inspection – was that an item could shake loose, fall from the roof, and strike someone on the sidewalk below. See *Towles v. Cox*, 181 Ga. App. 194, 197-198 (1) (351 SE2d 718) (1986) (concluding that jury was authorized to find that a reasonable person would foresee "that dangerous construction activity might physically encroach upon the sidewalk and thereby present a danger" to those on the sidewalk). Indeed, RYR acknowledged that there was a danger of objects falling from the hotel roof as a result of the demolition, and Bossier testified that he told RYR to ensure that nothing fell from the roof, thereby indicating that Cajun was aware of the risk of falling objects.

Furthermore, the fact that Cajun and RYR may not have specifically anticipated that the falling item would be a loose pipe on a cabana is immaterial because, as we have explained, it is "not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye." (Citations and punctuation omitted.) *Gen. Motors Corp. v. Davis*, 141 Ga. App. 495, 497 (2) (233 SE2d 825) (1977). "The [plaintiff] [does] not need to prove that the [defendant] might or should have seen the likelihood of the particular injury or harm, the extent of the harm, or the manner in

17

which it occurred, but only that [the defendant] should have anticipated that some injury or harm might result from [its] conduct." *Stern v. Wyatt*, 140 Ga. App. 704, 706 (1) (231 SE2d 519) (1976). See *Halilovic v. Penske Truck Leasing*, 287 Ga. App. 215, 219 (651 SE2d 160) (2007) (noting that "in order for a party to be liable for his negligence, it is not necessary that he should have been able to anticipate particular consequences which ensued, but it is sufficient if in ordinary prudence he might have foreseen that some injury would result from his act or omission") (emphasis omitted). Accordingly, the jury was entitled to resolve the issues of foreseeability and proximate cause in favor of Laguerre and against Cajun, and the trial court committed no error in denying Cajun's motion for new trial on the asserted ground. See *Towles*, 181 Ga. App. at 197-198 (1).

(c) Cajun contends that it is entitled to a new trial because the jury apportioned no fault to AWH Partners. Pretermitting whether Cajun waived this issue by failing to object to the form of the verdict before the jury dispersed,[9] we discern no grounds for reversal.

Georgia's apportionment statute, OCGA § 51-12-33,

---

[9] See *Goldstein, Garber & Salama, LLC v. J. B.*, 335 Ga. App. 416, 426-427 (4) (a) (779 SE2d 484) (2015), reversed on other grounds, 300 Ga. 840 (797 SE2d 87) (2017), and vacated on remand, 344 Ga. App. 110 (808 SE2d 913) (2017).

18

is designed to apportion damages among all persons or entities who contributed to the alleged injury or damages – even persons who are not and could not be made parties to the lawsuit. A person will be considered to have contributed to the alleged injury where that person is shown to have breached a legal duty in the nature of a tort that is owed for the protection of the plaintiff, the breach of which is a proximate cause of his injury.

(Citations and punctuation omitted.) *Martin v. Six Flags Over Georgia II*, 301 Ga. 323, 337 (III) (801 SE2d 24) (2017).

We turn now to the particular theory of non-party fault at issue here. It is undisputed that AWH Partners was one of the owners of the hotel. "Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. "Because the owner or occupier's duties to keep the premises and approaches safe are statutory (OCGA § 51-3-1), those duties are non-delegable even though the owner has a contract for another party to provide [the work]. OCGA § 51-2-5 (4)[.]" (Citation omitted.) *Griffin v. AAA Auto Club South*, 221 Ga. App. 1, 2 (1) (470 SE2d 474) (1996). Laguerre argues, however, that there was evidence presented at trial that AWH Partners surrendered possession of the pool

19

construction area to Cajun, thus relieving AWH Partners of its duties with respect to that portion of the hotel premises. We agree with Laguerre.

"Under the laws of this State, a property owner is not liable to any person who is injured on the property if full possession and complete control of the property were delivered and surrendered to an independent contractor." (Citation and punctuation omitted.) *Nair v. Aramark Food Svc. Corp.*, 276 Ga. App. 793, 794-795 (625 SE2d 78) (2005). "The same rule applies where a [property owner] surrenders a portion of his premises to an independent contractor – the [owner] is relieved of his duties with regard to the portion of the premises which he no longer controls." *Towles*, 181 Ga. App. at 195-196 (1). "As to that portion, the contractor incurs a duty to exercise ordinary care toward keeping the property safe for others who may be invited to it expressly or impliedly." *Bartlett v. Holder Constr. Co.*, 244 Ga. App. 397, 399 (535 SE2d 537) (2000). In this context, "possession means having personal charge of or exercising the rights of management or control over the property in question." *Hess v. Textron Automotive Exteriors*, 245 Ga. App. 264, 266 (536 SE2d 291) (2000). Whether possession and control over all or part of the premises has been delivered by the property owner to a contractor is a question of fact that normally the jury must resolve. *Bartlett*, 244 Ga. App. at 399.

In his recorded deposition testimony as the Rule 30 (b) (6) representative for Cajun that was admitted and played at trial, Bossier acknowledged that Cajun "kept the doors locked to the pool area so guests and employees couldn't come in. We controlled the work site and the work flow." And, as discussed supra, there was testimony that RYR made no decisions about the work on the construction site without first talking to Cajun and that Cajun controlled the time, manner, and method in which the work was performed at the site. This combined testimony, construed in the light most favorable to the verdict, would support a finding by the jury that AWH Partners surrendered possession of the pool construction site to Cajun and thus was relieved of its duties as to that particular area of the hotel. See *Bartlett*, 244 Ga. App. at 399 (concluding that jury had to resolve whether owner surrendered construction site to contractor, where contractor maintained fence around the site on a daily basis, coordinated access to the site through its superintendent, required subcontractors working at the site to provide it daily reports, and promulgated rules that subcontractors had to follow). And, the jury could further find that 100 percent of the fault should be apportioned to Cajun based on the evidence (as previously discussed) that Cajun failed to inspect or have RYR inspect the cabanas at the pool construction site and secure or remove any loose items found there prior to commencement of the

21

demolition. Consequently, the trial court did not err in denying Cajun's motion for new trial based on the jury's apportionment of fault.

2. Cajun contends that the trial court erred in awarding $1,050,000 in attorney fees to Laguerre pursuant to OCGA § 9-11-68. We do not agree.

"OCGA § 9-11-68, which is commonly referred to as Georgia's 'offer of settlement" statute, was enacted to encourage litigants in tort actions to make good faith efforts to settle cases in order to avoid unnecessary litigation." *Anglin v. Smith*, 358 Ga. App. 38, 39 (853 SE2d 142) (2020). With respect to offers of settlement made by a plaintiff to a defendant, OCGA § 9-11-68 provides in relevant part:

> If a plaintiff makes an offer of settlement which is rejected by the defendant and the plaintiff recovers a final judgment in an amount greater than 125 percent of such offer of settlement, the plaintiff shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the plaintiff or on the plaintiff's behalf from the date of the rejection of the offer of settlement through the entry of judgment.

OCGA § 9-11-68 (b) (2). Additionally, to recover attorney fees for a rejected offer to settle a tort claim, the plaintiff's offer must meet the requirements set forth in OCGA § 9-11-68 (a), including the requirement that the offer state with particularity the

amount proposed to settle a claim for punitive damages.[10] See OCGA § 9-11-68 (a) (6); *Chadwick v. Brazell*, 331 Ga. App. 373, 375-377 (2) (771 SE2d 75) (2015). If the aforementioned criteria have been satisfied, the trial court "shall order the payment of attorney's fees and expenses of litigation" to the plaintiff. OCGA § 9-11-68 (d) (1).

---

[10] OCGA 9-11-68 (a) provides:

At any time more than 30 days after the service of a summons and complaint on a party but not less than 30 days (or 20 days if it is a counteroffer) before trial, either party may serve upon the other party, but shall not file with the court, a written offer, denominated as an offer under this Code section, to settle a tort claim for the money specified in the offer and to enter into an agreement dismissing the claim or to allow judgment to be entered accordingly. Any offer under this Code section must:

(1) Be in writing and state that it is being made pursuant to this Code section;

(2) Identify the party or parties making the proposal and the party or parties to whom the proposal is being made;

(3) Identify generally the claim or claims the proposal is attempting to resolve;

(4) State with particularity any relevant conditions;

(5) State the total amount of the proposal;

(6) State with particularity the amount proposed to settle a claim for punitive damages, if any;

(7) State whether the proposal includes attorney's fees or other expenses and whether attorney's fees or other expenses are part of the legal claim; and

(8) Include a certificate of service and be served by certified mail or statutory overnight delivery in the form required by Code Section 9-11-5.

23

"Such an award may be disallowed only where the trial court finds the settlement offer was not made in good faith. See OCGA § 9-11-68 (d) (2)." *Anglin*, 358 Ga. App. at 40. We review a trial court's determination as to the amount of fees to be awarded only for an abuse of discretion. *Eaddy v. Precision Franchising*, 320 Ga. App. 667, 670 (739 SE2d 410) (2013).

Guided by these principles, we turn to the record in the present case. Laguerre filed his lawsuit on April 20, 2017. After written discovery had been conducted and Laguerre (but not the defendants) had been deposed, Laguerre served Cajun with an offer to settle the case for $75,000 on April 24, 2018.[11] The offer stated that it was intended "to fully satisfy all claims presented in this matter . . . , including all claims for injuries arising out of the incident that occurred on or about July 20, 2015, which is the subject of [this] civil action," and that the "offer includes any claims for punitive damages." Cajun rejected the offer and served Laguerre with two offers of

---

[11] Earlier in the litigation, on January 24, 2018, Laguerre served the Hotel Defendants and Cajun with a global offer to settle the case for $250,000, which was rejected. See OCGA § 9-11-68 (c) (stating in relevant part that "[t]he fact that an offer is made but not accepted does not preclude a subsequent offer"). The trial court did not predicate its award of attorney fees on the rejected January 2018 offer, and thus we discuss that offer no further.

settlement, one for $25,000 and the other for $50,000, both of which were rejected by Laguerre.

The $5,250,000 judgment subsequently entered by the trial court on the jury verdict was greater than 125 percent of Laguerre's April 2018 offer. Laguerre filed his motion for attorney fees under OCGA § 9-11-68 predicated on the rejected April 2018 offer and presented evidence of a contingency fee contract entitling his trial counsel to 40 percent of all gross amounts collected, plus any out-of-pocket expenses incurred.

Laguerre submitted the affidavits of his two trial counsel in support of his motion. His first trial counsel estimated that based on her review of her case file, she worked 250 hours on the case after Cajun's rejection of the April 2018 offer, and his second trial counsel estimated that based on her review of her case file, she worked 450 hours on the case after the offer was rejected, for a combined total of 700 hours. According to the affidavit testimony, those hours were spent by the two law firms

> on client management and preparation, discovery, depositions, retention and preparation of expert witnesses, pretrial strategy, coordination of and conduction of focus groups, negotiations, all pretrial Motions, Motions in limine, Trial Briefs, Charges, the Verdict Form, the Pre-Trial Order, and other writings; review of all case depositions to prepare for designations; as well as all Hearings and the Pre-Trial Conference[, and]

25

. . . all aspects of the trial of this case including jury selection, opening statement and closing arguments, examination of witnesses, preparation of exhibits and demonstratives and trial strategy.

Both trial attorneys, who had years of experience litigating personal injury and premises liability cases, averred that a 40 percent contingency fee was customary and reasonable in premise liability cases involving the same level of complexity and injuries as the present one.

Laguerre also submitted the affidavit of an expert witness – an attorney with experience and expertise practicing in the area of tort and insurance litigation in Georgia since 1981 – who averred that "[i]n personal injury litigation in the United States, almost all representation is done on a contingent fee basis." He opined that "ordinary, customary and reasonable contingent attorney fees in metropolitan Atlanta encompass charging. . . forty percent (40%) of any and all amounts recovered after commencement of litigation," and that "[i]n a litigated premises case involving multiple corporate defendants and a mild traumatic brain injury, a contingent fee of forty percent (40%) is usual and customary." (Emphasis omitted.) He further opined that "[b]ased on the amount and nature of work Plaintiff's counsel performed, as well

as the value added to the case by their experience and expertise, a contingent fee of forty percent (40%) is reasonable in this case."

Based on the 40 percent contingency fee, Laguerre noted in his motion that he had incurred $2,100,000 in attorney fees predicated on the $5,250,000 judgment, and he sought to recover from Cajun the pro-rata portion of reasonable fees incurred after the rejection of the April 2018 offer through the date of the entry of judgment. Laguerre presented the trial court with three alternative approaches for calculating the pro-rata value of legal services provided by his trial counsel, which he termed the "'Value Added Over Defense Offer' Approach," resulting in a proposed fee award of $2,080,000; the "'Value Added Over Plaintiff's 9-11-68 Offer' Approach," resulting in a proposed fee award of $2,070,000; and the "'Percentage of Work Performed' Approach," resulting in a proposed fee award of $1,911,000.

Cajun opposed Laguerre's motion for fees, contending that his April 2018 offer was defective because it failed to state with particularity the amount proposed to settle his punitive damages claim, as required by OCGA § 9-11-68 (a) (6). Cajun further argued that Laguerre was not entitled to a fee award based on the 40 percent contingency fee because he presented insufficient evidence of the value of the legal services actually rendered by his trial counsel. Additionally, Cajun contended that if

the trial court awarded attorney fees, the court should reject Laguerre's three alternative approaches for calculating the pro-rata value of legal services provided by his trial counsel and instead calculate fees by multiplying a reasonably hourly rate times the number of hours expended after the rejection of the offer. According to Cajun, "[a]ssuming counsel's estimates of 700 hours is correct, then at a rate of $500 per hour, Laguerre's attorneys' fees amount to no more than $350,000," and the award of attorney fees should not exceed that amount.

The trial court conducted a hearing on Laguerre's fees motion. Laguerre did not introduce any additional evidence at the hearing, but Cajun presented expert testimony challenging the amount of fees requested by Laguerre. Following the hearing, the trial court entered a detailed order awarding attorney fees and litigation expenses to Laguerre. The trial court found that Laguerre's April 2018 offer met the statutory requirements of OCGA § 9-11-68, and that a 40 percent contingency fee "is usual and customary and is reasonable under the circumstances in this case." The trial court then considered what method should be used for calculating the pro-rata value of legal services provided by Laguerre's trial counsel after the rejection of his April 2018 offer through the date of the entry of judgment. The trial court ultimately declined to use any of the three alternative approaches suggested by Laguerre that

28

would have resulted in a fees award of up to $2,080,000. Instead, the trial court "multipl[ied] the number of hours expended (700) with an hourly rate it believe[d] [was] reasonable in this case ($500) for a total of $350,000." The trial court continued:

> [$350,000], however, is just the starting point. Given that [Laguerre's] counsel obtained a result worth 73 times more than the Offer of Judgment, the Court will add a multiplier of three times the $350,000 guide for a total of $1,050,000 in recognition of the outstanding work by [Laguerre's] counsel in obtaining such a substantial verdict on behalf of [Laguerre].[12] Accordingly, the trial court awarded Laguerre $1,050,000 in attorney fees, which Cajun now contests on appeal.

(a) Cajun first contends that the trial court erred in awarding Laguerre attorney fees because his April 2018 offer was procedurally defective. Specifically, Cajun contends that the April 2018 offer was invalid because it did not state with particularity the amount proposed to settle Laguerre's punitive damages claim and thus did not comply with OCGA § 9-11-68 (a) (6). Because Laguerre's claim for punitive damages was not pending at the time he made his offer of settlement, this contention is unavailing.

---

[12] The trial court also awarded Laguerre $45,196.47 in litigation expenses predicated on the evidence of expenses provided by Laguerre's trial attorneys.

OCGA § 9-11-68 (a) (6) provides that an offer of settlement must "[s]tate with particularity the amount proposed to settle a claim for punitive damages, if any." In *Chadwick*, 331 Ga. App. 373, we construed OCGA § 9-11-68 (a) (6) to mean that if a plaintiff asserts a claim for punitive damages, and "*such claim was pending at the time the offer was made*," then the plaintiff is required to state with particularity the amount proposed to settle that claim. (Emphasis supplied.) Id. at 377 (2). We noted that "[i]f there is no claim for punitive damages, a party can ignore the requirement of subsection (a) (6)." Id. at 376-377 (2).

Laguerre's April 2018 offer stated that it was intended to fully satisfy all claims arising out of the July 20, 2015 incident and included "any claims for punitive damages," but, notably, Laguerre's complaint did not include a claim for punitive damages at the time the offer was made. Laguerre did not amend his complaint to add a punitive damages claim until July 24, 2018, after service and rejection of the April 2018 offer. Accordingly, because there was no punitive damages claim pending at the time Laguerre made his April 2018 offer, the requirement imposed by OCGA § 9-11-68 (a) (6) was inapplicable. *Chadwick*, 331 Ga. App. at 376-377 (2). Consequently, Cajun's contention is misplaced.

30

(b) Cajun further contends that the trial court erred in awarding Laguerre attorney fees because Laguerre presented insufficient evidence of the value of legal services actually rendered by his trial counsel to support an award of fees. We disagree.

> It is well-settled that an award of attorney fees is to be determined upon evidence of the reasonable value of the professional services which underlie the claim for attorney fees. . . . A court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. When a party seeks fees based on a contingent fee agreement, however, the party must show that the contingency fee percentage was a usual or customary fee for such case and that the contingency fee was a valid indicator of the value of the professional services rendered. In addition, the party seeking fees must also introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered.

(Citations and punctuation omitted.) *Ga. Dept. of Corrections v. Couch*, 295 Ga. 469, 483 (3) (a) (759 SE2d 804) (2014).

Laguerre introduced evidence that he agreed to pay a 40 percent contingency fee to his trial counsel, and he filed affidavits from his counsel and an expert testifying that such a fee was customary and reasonable in premise liability cases

involving the level of complexity and injuries as the present one, and given the expertise of counsel and the amount of work they performed. Laguerre's trial counsel provided estimates, based on their review of their case files, as to the number of hours they spent on the case before and after the offer of settlement. There also was affidavit testimony describing the work that the attorneys performed on the case after the offer of settlement was rejected and the litigation expenses they incurred. Based on this record, the trial court acted within its discretion in finding that Laguerre provided sufficient evidence of the value of the professional services actually rendered by his trial counsel. See *City of Atlanta v. Hofrichter/Stiakakis*, 291 Ga. App. 883, 889-890 (3) (663 SE2d 379) (2008) (40 percent contingency fee contract and attorney's testimony that such a fee was customary in that kind of case, that he and co-counsel had taken over 26 depositions and had spent hundreds of hours on the litigation, and that his firm had expended $38,948.04 in litigation expenses were sufficient to establish the value of the professional services actually rendered).

Citing to *Kennison v. Mayfield*, 359 Ga. App. 52, 68-69 (2) (c) (856 SE2d 738) (2021) (en banc), Cajun argues that a "hindsight" estimate by trial counsel is insufficient to show the number of hours spent by counsel on the case, and that counsel "should . . . have started keeping contemporaneous time records" after

32

making the settlement offer and should have introduced those records into evidence. As an initial matter, the division of Presiding Judge Doyle's opinion in *Kennison* addressing the evidence of counsel's time worked on the case is not binding precedent because a majority of the judges did not fully concur in the rationale of that division. See id. at 67-69 (2) (c); Court of Appeals Rule 33.2 (a) (1). In any event, *Kennison* is distinguishable because counsel in that case broadly testified that he "possessed more than 20,000 digital files for the case," 359 Ga. App. at 69 (2) (c), and that "the case took no less than 4,000 and up to 6,000 hours over the entire case," id. at 68 (2) (c), n. 35, a far more generalized description than was provided by Laguerre's counsel. Moreover, *Kennison* expressly contemplated that counsel in contingency fees cases could provide reasoned estimates of the number of hours they worked without having to rely on contemporaneous detailed time records; in this regard, Presiding Judge Doyle noted that "[t]he better practice in contingency fee cases is, when anticipating an award under OCGA § 9-11-68 (b), to provide some *estimate* of the value of legal services actually rendered," id. at 69 (2) (c) (emphasis supplied), and further noted that "[t]his does not amount to a requirement, nor do we impose one, that contingency fee matters must be contemporaneously tracked in a manner similar to the assiduous tenth-of-an-hour record keeping commonly done in

33

matters billed by the hour." Id. Accordingly, contrary to Cajun's argument, *Kennison* does not require reversal of the trial court in the present case.

(c) Lastly, Cajun contends that the trial court erred in its award of attorney fees to Laguerre by applying a multiplier when calculating the fee award in recognition of the superior performance and results obtained by Laguerre's trial counsel. According to Cajun, the trial court essentially employed a lodestar method for computing attorney fees by multiplying the number of hours reasonably spent by Laguerre's counsel by a reasonable hourly rate.[13] However, Cajun maintains that the trial court erred by then enhancing the fee award based on the quality of the attorneys' performance and the results obtained in the litigation. In support of its argument, Cajun relies on the lodestar methodology employed by federal courts and emphasizes that the circumstances under which a fee award can be enhanced based on the quality of the work performed and the results obtained are limited under federal law. See

---

[13] Under . . . the 'lodestar' method of computing fees, a trial court must multiply the number of hours reasonably spent by trial counsel by a reasonable hourly rate. This figure can then be adjusted upward or downward for certain factors known as multipliers, such as contingency and the quality of the work performed, to arrive at a final fee." (Citation and punctuation omitted.) *Friedrich v. Fidelity Nat. Bank*, 247 Ga. App. 704, 706 (545 SE2d 107) (2001).

*Perdue v. Kenny A.*, 559 U.S. 542, 554-557 (IV) (B) (130 S Ct 1662, 176 LE2d 494) (2010). We are unpersuaded.

Cajun has cited to no authority requiring the trial court, when determining the amount of fees to award in the contingency fee context, to specifically employ the lodestar methodology used by federal courts. Nor did the trial court purport to employ such a methodology. Rather, consistent with *Couch*, the trial court considered the three alternative approaches that were proposed by Laguerre for valuing fees owed under the contingency fee agreement after the rejection of the April 2018 offer through the entry of judgment, which would have resulted in a fees award of up to $2,080,000, but then declined to award that amount as a reasonable fee after taking into account evidence of hours (700), rates ($500), and other indications of the value of the professional services actually rendered (the "substantial verdict" resulting from the "outstanding work" done by counsel on behalf of Laguerre). See *Couch*, 295 Ga. at 483 (3) (a) (trial court awarding fees in contingency fee context may consider the contingency fee agreement in determining the reasonableness and amount of fees, but the court also must consider "evidence of hours, rates, or some other indication of the value of the professional services actually rendered") (citation and punctuation omitted). The end result was that the trial court *reduced* the amount of fees from what

35

would have been owed under the contingency fee agreement to $1,050,000, which was within the range of the evidence. Under these circumstances, we cannot say that the trial court abused its discretion in calculating the amount of reasonable attorney fees to award to Laguerre. See *Khalia, Inc. v. Rosebud*, 353 Ga. App. 350, 355-356 (3) (836 SE2d 840) (2019) (physical precedent only) (in case involving OCGA 9-11-68, trial court acted within its discretion by declining to award plaintiff full amount of fees due under contingency fee agreement, where there was "evidence before [the] trial court that 200 hours was a reasonable amount of time for counsel to spend from [the] rejection of [the] offer of judgment through trial and that $250 per hour was a reasonable rate for this lawyer," and the court entered "an award of nearly three times [that] amount"); *Shiv Aban, Inc. v. Ga. Dept. of Transp.*, 336 Ga. App. 804, 820 (2) (c) (784 SE2d 134) (2016) (upholding trial court's attorney fee award, where trial court compared amount of fees owed under contingency fee agreement "to the fee that would have been incurred under hourly billing" and then applied a "risk premium of two times the hourly rate").

In reaching this conclusion, we also reject an additional argument made by Cajun regarding guidance provided by Florida law. Specifically, Cajun argues that OCGA § 9-11-68 is modeled after Florida's offer-of-judgment statute, that Georgia

36

courts therefore should look to Florida for guidance in how to interpret our statute, and that the Florida Supreme Court has rejected the use of a multiplier in awarding attorney fees for a rejected offer. See *Sarkis v. Allstate Ins. Co.*, 863 So2d 210 (Fla. 2003) (per curiam). It is true that OCGA § 9-11-68 is generally modeled after the Florida offer-of-judgment statute, see *Richardson v. Locklyn*, 339 Ga. App. 457, 459 (793 SE2d 640) (2016), but the two statutes are not identical. In contrast to OCGA § 9-11-68, the Florida statute, Fla. Stat. § 768.79, refers to guidelines established by the Florida Supreme Court for calculating attorney fees:

> If a plaintiff serves an offer which is not accepted by the defendant, and if the judgment obtained by the plaintiff is at least 25 percent more than the amount of the offer, the plaintiff shall be awarded reasonable costs, including investigative expenses, and attorney's fees, *calculated in accordance with the guidelines promulgated by the Supreme Court*, incurred from the date the offer was served.

(Emphasis supplied.) Fla. Stat. Ann. § 768.79 (6) (b). The Supreme Court of Florida has promulgated such guidelines. See Fla. R. Civ. P. 1.442 (h) (2).[14] And, in the

---

[14] Fla. R. Civ. P. 1.442 (h) (2) provides:
    (2) When determining the reasonableness of the amount of an award of attorneys' fees pursuant to this section, the court shall consider, along with all other relevant criteria, the following factors:
    (A) The then-apparent merit or lack of merit in the claim.

*Sarkis* case relied upon by Cajun, the Florida Supreme Court based its decision rejecting the use of a multiplier when calculating attorney fees in the offer-of-settlement context in part on the fact that the Court had "set forth in rule 1.442 the factors to be considered in determining a reasonable amount of attorney fees awarded as sanctions," but had "not included the use of a multiplier in the rule as a factor to be considered." 863 So2d at 218. See also id. at 223 (noting that Fla. R. Civ. P. 1.442 did not "authorize[ ] the use of a multiplier in determining the amount of attorney fees as a sanction for the rejection of an offer"). Hence, the Florida Supreme Court's conclusion that trial courts should not employ a multiplier was predicated in part on the guidelines for calculating fees established by that Court and referenced in the Florida statute. Georgia does not have similar guidelines adopted by our Supreme Court and referenced in OCGA § 9-11-68. Cajun's reliance on Florida law thus is

---

(B) The number and nature of proposals made by the parties.

(C) The closeness of questions of fact and law at issue.

(D) Whether the party making the proposal had unreasonably refused to furnish information necessary to evaluate the reasonableness of the proposal.

(E) Whether the suit was in the nature of a test case presenting questions of far-reaching importance affecting nonparties.

(F) The amount of the additional delay cost and expense that the party making the proposal reasonably would be expected to incur if the litigation were to be prolonged.

misguided in this specific context and provides no rationale for reversing the trial court here.

*Case No. A21A0311*

3. In this related appeal, Cajun challenges the trial court's order granting summary judgment in favor of the Hotel Defendants on their cross-claims for contractual indemnification.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." *Griffiths v. Rowe Properties*, 271 Ga. App. 344, 344 (1) (609 SE2d 690) (2005).

So viewed, and as previously noted, in March 2015, Cajun entered into the Trade Contract under which it agreed to "provide and furnish . . . all of the work, labor, supervision, services, materials and equipment" required for completion of the construction and renovation project at the Crowne Plaza Atlanta-Midtown Hotel

owned and operated by the Hotel Defendants. Pertinent to the present appeal, the

Trade Contract contained an indemnification provision that stated:

> To the fullest extent permitted by law, Contractor shall defend, indemnify and hold Owner harmless from and against any and all claims, damages, losses, liabilities and expenses, including without limitation attorney's fees, arising out of or resulting from the performance of the Work or Contractor's failure to comply with the terms and provisions of the Contract, to the extent caused in whole or in part by any intentional, negligent or otherwise wrongful acts or omissions of Contractor or anyone for whose acts it may be liable including employees, subcontractors and consultants. The indemnification obligation under this Paragraph shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable to the Contractor under worker's compensation acts, disability benefit acts, other employee benefit acts or insurance policies. The provisions of this Paragraph shall survive the expiration or earlier termination of this Contract. The Contractor shall include a similar indemnity agreement in all Subcontracts, and require that any sub-subcontracts entered into by Subcontractors shall have a similar indemnity provision. Contractor shall take all necessary precautions to properly protect the Work and the property and work of Owner or any other persons on the Project Site, from damages caused by the actions of Contractor or any of its Subcontractors. Contractor shall be liable for any loss of, or damage to, any such property or any injuries to any persons that are caused by the action or neglect of Contractor or

any of its employees, subcontractors or consultants. (The "Indemnity Provision.")

The terms of the Trade Contract were applicable to subsequent change-work orders, including the change-work order for the renovations of the rooftop pool deck at the center of these appeals.

Before the present lawsuit was filed by Laguerre, the Hotel Defendants requested that they be defended and indemnified by Cajun against any claims asserted by Laguerre for his injuries resulting from the fallen metal pipe, but Cajun declined the request. Once the lawsuit commenced, the Hotel Defendants filed their answer, denying that they were liable to Laguerre, and they asserted cross-claims against Cajun for breach of common law indemnity, breach of contractual indemnity, breach of an express contractual duty to indemnify, and common law contribution.

Following discovery, the Hotel Defendants moved for partial summary judgment on their cross-claims against Cajun for contractual indemnification predicated on the Indemnity Provision. The trial court denied the motion "without prejudice," concluding that the motion was "premature" because there had not yet been "a determination of the [Hotel] Defendants' liability obligations, as well as a determination of negligence [by] . . . Cajun."

41

After the trial court denied the Hotel Defendants' motion for partial summary judgment, they tendered another request for defense and indemnity pursuant to the Indemnity Provision. As part of their tender, the Hotel Defendants asked Cajun to respond to Laguerre and take steps to effectuate a "global settlement" on their behalf. Cajun did not accept the tender made by the Hotel Defendants.

As pointed out supra, shortly before trial, the Hotel Defendants reached a settlement with Laguerre under which they agreed to pay him $1,000,000. Following the trial and verdict, the Hotel Defendants filed a renewed motion for summary judgment on their contractual indemnity cross-claims, seeking recovery from Cajun of the $1,000,000 settlement they paid to Laguerre based on the Indemnity Provision. Cajun opposed the motion, contending that the Indemnity Provision was void under OCGA § 13-8-2 (b) because it did not exclude indemnity for the Hotel Defendants' own negligence. Cajun also argued that the settlement was "exorbitant and unreasonable" because the jury in the underlying tort action had apportioned no fault to the Hotel Defendant listed on the special verdict form (AWH Partners).

After conducting a hearing, the trial court granted the Hotel Defendants' motion for summary judgment, ruling that, as a matter of law, they were entitled to indemnification for their $1,000,000 settlement with Laguerre based on the Indemnity

42

Provision. The trial court concluded that the Indemnity Provision covered the settlement and did not violate OCGA § 13-8-2 (b). Additionally, the trial court determined that the settlement between the Hotel Defendants and Laguerre was reasonable under the circumstances. In this regard, the trial court found that "[t]he $5,000,000.00 verdict shows that [Laguerre's] injuries were substantial, and it was not unreasonable for the [Hotel] Defendants to limit their potential liability at $1,000,000.00, which, subsequently, avoided any possibility of the entry of a larger verdict and additional attorney's fees against them."

(a) Cajun contends that the trial court erred in granting summary judgment to the Hotel Defendants because the Indemnity Provision "contemplates indemnity for [the Hotel Defendants'] own negligence in violation of Georgia's anti-indemnification statute, OCGA § 13-8-2 (b)," thereby rendering the Indemnity Provision void and unenforceable as a matter of law. We disagree.

"As a general rule, a party may contract away liability to the other party for the consequences of his own negligence without contravening public policy, except when such agreement is prohibited by statute." (Citation and punctuation omitted.) *Milliken & Co. v. Ga. Power Co.*, 306 Ga. 6, 8 (1) (829 SE2d 111) (2019). OCGA § 13-8-2 (b) creates such a statutory prohibition. It provides in relevant part:

43

A covenant, promise, agreement, or understanding in or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair, or maintenance of a building structure, appurtenances, and appliances, including moving, demolition, and excavating connected therewith, purporting to require that one party to such contract or agreement shall indemnify, hold harmless, insure, or defend the other party to the contract or other named indemnitee, including its, his, or her officers, agents, or employees, against liability or claims for damages, losses, or expenses, including attorney fees, arising out of bodily injury to persons, death, or damage to property caused by or resulting from the sole negligence of the indemnitee, or its, his, or her officers, agents, or employees, is against public policy and void and unenforceable. . . .

Analyzing OCGA § 13-8-2 (b), our Supreme Court has explained that "an indemnification provision is void if it (1) relates in some way to a contract for construction, alteration, repair, or maintenance of certain property and (2) promises to indemnify a party for damages arising from that own party's sole negligence." (Citation, punctuation, and emphasis omitted.) *Milliken & Co.*, 306 Ga. at 9 (1). See *Kennedy Dev. Co. v. Camp*, 290 Ga. 257, 259 (719 SE2d 442) (2011).

It is undisputed that the Indemnity Provision relates to a contract for the construction of certain property. Hence, the question on appeal is whether the

44

Indemnity Provision requires Cajun to indemnify the Hotel Defendants for damages arising from their sole negligence. We conclude that it does not.

In determining whether an indemnification provision in a construction contract impermissibly promises to indemnify a party for that party's sole negligence, we look to the language in the contract. See *Milliken & Co.*, 306 Ga. at 12 (1) (b); *Havenbrook Homes v. Infinity Real Estate Investments*, 356 Ga. App. 477, 485 (1) (c) (847 SE2d 840) (2020). "The cardinal rule of contract construction is to ascertain the intention of the parties. When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent." (Citations and punctuation omitted.) *Langley v. MP Spring Lake*, 307 Ga. 321, 324 (834 SE2d 800) (2019). "On appeal, this Court's review of a trial court's construction of a contract is de novo." *Borders v. City of Atlanta*, 298 Ga. 188, 197 (II) (779 SE2d 279) (2015).

As previously noted, the Indemnity Provision requires Cajun to indemnify the Hotel Defendants "[t]o the fullest extent permitted by law" for claims or damages "arising out of or resulting from the performance of the Work or [Cajun's] failure to comply with the terms and provisions of the [Trade] Contract, to the extent caused in whole or in part by any intentional, negligent or otherwise wrongful acts or omissions of [Cajun] or anyone for whose acts it may be liable including employees,

45

subcontractors and consultants." The last sentence of the Indemnity Provision further states that Cajun "shall be liable for any loss of, or damage to, any such property or any injuries to any persons that are caused by the action or neglect of [Cajun] or any of its employees, subcontractors or consultants."

By its plain language, application of the Indemnity Provision is limited to circumstances where the damages were caused in whole or in part by the intentional, negligent, or wrongful acts or omissions of Cajun or those for whom Cajun may be held liable including its employees, subcontractors, and consultants. Hence, the Indemnity Provision does not require indemnification when damages were caused solely by the Hotel Defendants' negligence. In so concluding, we note that "in construing contracts, the rules of grammatical construction usually govern,"[15] and one such rule is that "a qualifying phrase separated from antecedents by a comma as found in this case is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." (Citation and punctuation omitted.) *Lucas v. Beckman Coulter*, 303 Ga. 261, 264, n. 6 (811 SE2d 369) (2018). See *Facebook v. Duguid*, __ U. S. __, __ (II) (A) (141 SCt 1163, 209

---

[15] (Citation and punctuation omitted.) *L&B Constr. Co. v. Ragan Enterprises*, 267 Ga. 809, 813 (482 SE2d 279) (1997).

46

LE2d 272) (2021) (discussing and applying the "series-qualifier canon"). Thus, the

qualifying phrase contained in the Indemnity Provision – "to the extent caused in

whole or in part by any intentional, negligent or otherwise wrongful acts or omissions

of [Cajun] or anyone for whose acts it may be liable including employees,

subcontractors and consultants" (the "Qualifying Phrase") – applies to *both*

antecedents contained in that sentence, i.e., "the performance of the Work *or*

[Cajun's] failure to comply with the terms and provisions of the [Trade] Contract."

(Emphasis supplied.) While Cajun argues that the Qualifying Phrase only applies to

the immediately preceding antecedent and thus does not apply to "the performance

of the Work," the last antecedent rule[16] is applicable only "where no contrary

intention appears," and a contrary intent is apparent in the present case based on the

separation of the Qualifying Phrase from both antecedents by a comma. (Citation and

punctuation omitted.) *Lucas*, 303 Ga. at 264, n. 6. See *Thornton v. State*, 310 Ga. 460,

467 (3) (851 SE2d 564) (2020) ("[The last antecedent] rule is not absolute, and the

---

[16] "Under . . . the rule of the last antecedent, a qualifying phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." (Citations and punctuation omitted.) *Scott v. State*, 299 Ga. 568, 572 (2) (788 SE2d 468) (2016). See *Key v. Georgia Dept. of Administrative Svcs.*, 340 Ga. App. 534, 537 (1) (b) (798 SE2d 37) (2017) (applying rule of last antecedent to contract provision).

47

inference it raises may be rebutted where the structure and internal logic of the statutory scheme so militate. Under the alternative series-qualifier principle, a qualifying phrase appearing at the end of a series should be read to apply to all items in the series when such an application would represent a natural construction.") (citation and punctuation omitted). See also *Facebook*, __ U. S. at __ (II) (A) (discussing and declining to apply "rule of the last antecedent").

Cajun further argues that even if the Qualifying Phrase applies to both antecedents, the Qualifying Phrase nevertheless requires it to indemnify the Hotel Defendants for any damages caused by "anyone for whose acts [Cajun] may be liable," and, according to Cajun, "anyone" could include the Hotel Defendants. Cajun, however, ignores the fact that the Qualifying Phrase refers to damages caused by "anyone for whose acts [Cajun] may be liable *including employees, subcontractors and consultants*." (Emphasis supplied.) The word "including" can have more than one plausible interpretation: "in some contexts, courts have held that 'include,' when used to introduce a list of items . . . , indicates that the list is exclusive and exhaustive, whereas in other contexts, courts have concluded that 'include' introduces a non-exclusive or illustrative list of examples." *Premier Health Care Investments v. UHS of Anchor*, 310 Ga. 32, 39 (3) (b) (849 SE2d 441) (2020). See *Berryhill v. Ga.*

48

*Community Support & Solutions*, 281 Ga. 439, 440-441 (638 SE2d 278) (2006). In the present case, we construe "include" in the narrower sense as exclusive and exhaustive in light of the final sentence of the Indemnity Provision, which states that Cajun is responsible for indemnifying the Hotel Defendants only where property losses or damages or personal injuries were "caused by the action or neglect of [Cajun] *or any of its employees, subcontractors or consultants*." (Emphasis supplied.) As Georgia courts have repeatedly emphasized, "it is axiomatic that contracts must be construed in their entirety and in a manner that permits all of the terms contained therein to be consistent with one another." (Citation and punctuation omitted.) *Langley*, 307 Ga. at 324. The Qualifying Phrase therefore must be read consistently and in harmony with the final sentence of the Indemnity Provision. See id. Accordingly, the word "anyone" in the Qualifying Phrase cannot be construed to encompass the Hotel Defendants, given that they were not an employee, subcontractor, or consultant of Cajun.[17]

---

[17] We also note that under the ejusdem generis rule of construction, "[w]here general words are followed by a description of specified subjects, the meaning of the general words ordinarily will be presumed to be limited to the enumerated special subjects, and to include only those things of the same nature as those specially enumerated, unless a clear manifestation of a contrary intent appears[.]" *Jenkins v. Jones*, 209 Ga. 758, 761 (1) (75 SE2d 815) (1953). See *State Farm Fire & Cas. Co. v. Rowland*, 111 Ga. App. 743, 747 (143 SE2d 193) (1965) (applying ejusdem generis

In sum, read in its entirety and in accordance with the applicable rules of grammar and contract construction, the Indemnity Provision does not require Cajun to indemnify the Hotel Defendants for damages caused solely by the Hotel Defendants' own negligence. The Indemnity Provision therefore does not violate OCGA § 13-8-2 (b), as the trial court properly concluded.

(b) Cajun further contends that the trial court erred in granting summary judgment to the Hotel Defendants based on the court's finding that the uncontroverted evidence showed that the $1,000,000 settlement between Laguerre and the Crown Defendants was reasonable.

---

rule of construction when interpreting contract). Similarly, under the noscitur a sociis rule of construction, "a word or phrase may be known from its accompanying terms," and "words of general import, when associated together with other words of more specific import, are limited in a sense analogous to the more specific phrases." *Strickland v. Phillips Petroleum Co.*, 248 Ga. 582, 583 (1) (284 SE2d 271) (1981). See *Wilson v. Clark Atlanta Univ.*, 339 Ga. App. 814, 834 (2) (c) (794 SE2d 422) (2016) (applying noscitur a sociis rule of construction to interpret disputed document). Based on these rules of construction, even if we were to construe the word "including" in the Qualifying Phrase as introducing a non-exclusive list of parties for whom Cajun could be held liable, the word "anyone" still would not encompass the Hotel Defendants, given that they did not serve as agents or independent contractors of Cajun on the renovation project and thus were not analogous to Cajun's employees, subcontractors, or consultants. See *Wilson*, 339 Ga. App. at 834 (2) (c) (concluding that even if list of reasons for layoffs of professors contained in handbook was not an exhaustive list, the canons of ejusdem generis and noscitur a sociis still placed limits on the reasons that the university was authorized to give for laying off professors).

"Generally, the fact that an indemnitee has settled or compromised the underlying tort action brought by the injured party does not bar the indemnitee from pursuing a claim for indemnification or contribution from a third-party indemnitor." *U.S. Lawns v. Cutting Edge Landscaping*, 311 Ga. App. 674, 676 (1) (716 SE2d 779) (2011). See OCGA § 51-12-32 (c). However, the payment of the settlement by the indemnitee "[does] not of itself conclude the issue of liability" for purposes of obtaining indemnification from the indemnitor. *Union Camp Corp. v. Louisville & Nashville R. Co.*, 130 Ga. App. 113, 116 (2) (202 SE2d 508) (1973). Rather, to recover on the indemnification claim, the indemnitee must show that the settlement with the injured party "was reasonable, prudent and reached in good faith." (Citation and punctuation omitted.) Id.

(i) As an initial matter, we note that in opposing the Hotel Defendants' motion for summary judgment, Cajun suggested that their claim for indemnification failed as a matter of law because subsequent to the settlement, the jury in the underlying tort action apportioned no fault to AWH Partners, the Hotel Defendant included on the special verdict form. According to Cajun, the jury verdict showed that the Hotel Defendants had a complete defense to the underlying action and "zero" actual liability

51

for Laguerre's damages, such that they were foreclosed from recovering on their contractual indemnification claim. We are unpersuaded.

It is true that an indemnitee who settles or compromises an underlying tort action is not entitled to indemnification if the indemnitee "had a defense available which would have defeated the action but failed to assert it." (Citations and punctuation omitted.) *U.S. Lawns*, 311 Ga. App. at 676 (1). See *GAF Corp. v. Tolar Constr. Co.*, 246 Ga. 411, 412 (271 SE2d 811) (1980). But where, as here, "the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage." (Citation and punctuation omitted.) *Union Camp Corp.*, 130 Ga. App. at 116 (1). As persuasively explained by another court,

> [F]rom a practical standpoint, it would seem that where, as here, the indemnity right was triggered at the time the suit was filed, this gave rise to the indemnitee's right to settle at any time prior to or during the trial. The validity of such a settlement should then be determined by the circumstances existing at the time it was made. It is obvious that where the underlying action involves complicated legal issues and disputed

52

issues of fact and law, the ability to draw a bright line between liability and nonliability is not possible when a settlement is made prior to trial.

We do not believe that a subsequent event occurring after the settlement, which adversely reflects on the settlement, should automatically bar the indemnitee's ability to recover in the later indemnity action. The focus must remain on what was a reasonable judgment in light of the circumstances at the time the settlement was made. If this were not the rule, then loss of critical evidence occurring after the settlement could always be utilized by the indemnitor to defend against the settlement. In the present case, the indemnitor was not foreclosed from arguing that the settlement was unrealistic because of the [jury's finding of no fault]. [The indemnitor] was only foreclosed from utilizing it as an automatic bar because of the jury's finding.

*Valloric v. Dravo Corp.*, 357 SE2d 207, 213 (W. Va. 1987).

Accordingly, we conclude that in proving the reasonableness of the settlement reached in this case, the Hotel Defendants only had to "come forward with evidence reflecting that [they] *could have been held liable* in the underlying tort action had the case not been settled." (Emphasis supplied.) *U.S. Lawns*, 311 Ga. App. at 677 (1). See *S. Ry. Co. v. Ga. Kraft Co.*, 823 F2d 478, 480 (11th Cir. 1987) (holding that indemnitee who had notified indemnitor of lawsuit and given the indemnitor an opportunity to defend prior to settlement "was not required to prove that it actually

would have been liable to [the injured party], only that it was potentially liable" when it settled the underlying lawsuit); *Valloric*, 357 SE2d at 213 (indemnitee "must demonstrate that he was exposed to liability which could reasonably be expected to lead to an adverse judgment"). And given that the Hotel Defendants only needed to establish their potential rather than actual liability to Laguerre, the fact that the jury in the underlying tort action subsequently apportioned no fault to AWH Partners did not automatically defeat the Hotel Defendants' indemnification claim, although the jury's finding could be taken into account as one of the factors in assessing the reasonableness of the settlement reached in this case. See id.

(ii) In opposing summary judgment, Cajun also argued that there were genuine issues of material fact as to whether the amount of the settlement was reasonable under the circumstances. We agree with Cajun.

A party seeking contribution or indemnification "must prove that the settlement amount was reasonable." *Dept. of Transp. v. Montgomery Tank Lines*, 276 Ga. 105, 108 (1) (575 SE2d 487) (2003). See *Robert & Co. Assoc. v. Pinkerton & Laws Co.*, 120 Ga. App. 29, 33-34 (1) (169 SE2d 360) (1969) (indemnitee must prove "that the amounts paid in settlement of the actions were reasonable and not in excess of what

54

the claimants could have reasonably expected to obtain, under the facts and applicable law, had the cases been allowed to proceed to verdict and judgment").

As articulated by another jurisdiction,

A decision on whether a settlement amount is reasonable involves an overall evaluation of the extent of financial exposure the settling party faces if the party does not settle. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed. Relevant too is whether the indemnitee tendered its defense to the indemnitor, whether it kept the indemnitor informed of the settlement negotiations, and whether the indemnitor had an opportunity to approve the settlement. The reasonableness inquiry is usually fact intensive and can be legally complex.

(Citations and punctuation omitted.) *Chevron Oronite Co. v. Jacobs Field Svcs.*, 951 F3d 219, 235 (5th Cir. 2020). See *Valloric*, 357 SE2d at 214. As part of the assessment of whether the settlement amount is reasonable, judgments reached against similarly situated parties in other cases may be considered, see *Chevron Oronite Co.*, 951 F3d at 235-236, and parties may choose to present expert testimony on the issue. See *Otis Elevator v. Hardin Constr. Co. Group*, 450 SE2d 41, 44 (S. C. 1994). Questions regarding the reasonableness of the settlement are normally for a jury to decide. See *Wilson v. Norfolk S. Corp.*, 200 Ga. App. 523, 526 (5) (a) (409

SE2d 84) (1991); *Union Camp Corp.*, 130 Ga. App. at 116 (2); *Robert & Co. Assoc.*, 120 Ga. App. at 33-34 (1). See also *Joseph v. Certain Underwriters at Lloyd's London*, 356 Ga. App. 178, 185 (2) (b) (844 SE2d 852) (2020) ("Generally, questions of reasonableness are for the jury.").

Applying these principles, we conclude that the trial court erred in finding that the $1,000,000 settlement was reasonable as a matter of law. The trial court looked to the jury's award of $5,000,000 in compensatory damages against Cajun in the underlying tort litigation as evidence that Laguerre's damages were substantial. The trial court also noted that the Hotel Defendants made a tender of their defense to Cajun but Cajun refused to defend the Hotel Defendants. However, these factors did not *demand* a finding that the settlement amount was reasonable. Moreover, the Hotel Defendants did not present any affidavits or other evidence in support of their summary judgment motion that might have shed light on the reasonableness of the settlement amount, such as evidence of judgments entered in other cases involving similarly situated parties or expert opinion testimony. Under these circumstances, it was for a jury to determine whether the settlement was reasonable, and the trial court therefore erred in granting summary judgment in favor of the Hotel Defendants on their indemnification claim. See *Wilson*, 200 Ga. App. at 526 (5) (a); *Union Camp*

56

*Corp.*, 130 Ga. App. at 116 (2); *Robert & Co. Assoc.*, 120 Ga. App. at 33-34 (1). See generally *Johnson v. GAPVT Motors*, 292 Ga. App. 79, 83 (1) (663 SE2d 779) (2008) (summary judgment inappropriate where certain "conclusion . . . was *authorized* by the evidence, . . . [but] not *demanded* by the evidence") (emphasis in original).

*Judgment in Case No. A21A1120 affirmed. Judgment in Case No. A21A0311 reversed. Markle, J., concurs.  Gobeil, J., concurs fully in Case No. A21A0311 and in Divisions 1, 2 (a), and 2 (b) of Case No. A21A1120 and concurs specially in Division 2 (c) of Case No. A21A1120.*

A21A0311. CAJUN CONTRACTORS, INC. v. PEACHTREE

    PROPERTY SUB, LLC et al.

A21A1120. CAJUN CONTRACTORS, INC. v. LAGUERRE et al.


GOBEIL, Judge, concurring specially.

I concur fully with the opinion, except as to Division 2 (c), to which I concur in judgment only. More specifically, I concur that based on the record before us the trial court did not abuse its considerable discretion in awarding $1,050,000 in attorney fees to Plaintiff Max Laguerre. Nevertheless, I write this special concurrence

to raise concerns about the potential risks presented by a trial court's unfettered application of a multiplier to calculate the total amount of fees.

As noted by the majority, the trial court here multiplied the number of hours spent by the attorneys in this case (700 hours), as evidenced by attorney and expert affidavits about the time and type of work performed, and multiplied this by a reasonable hourly rate ($500), which yielded a total of $350,000. The court then added a multiplier of three to this figure for a total of $1,050,000 "in recognition of the outstanding work by [Laguerre's] counsel in obtaining such a substantial verdict on behalf of [Laguerre]." Although the court did not invoke any specific methodology, its calculation bears a striking resemblance to the lodestar method employed in federal courts.

> Under the lodestar method, courts determine attorney's fees based on the product of the reasonable hours spent on the case and a reasonable hourly rate. The product is known as the lodestar. Sometimes courts apply to the lodestar a multiplier, also known as an enhancement or an upward adjustment, to reward counsel on top of their hourly rates.

*In re Home Depot, Inc.*, 931 F3d 1065, 1076 (I) (D) (11th Cir. 2019) (citations and punctuation omitted). Georgia courts have not adopted the lodestar method in the

2

calculation of attorney fees.[1] And, under our existing case law, the trial court was not explicitly barred from applying a multiplier. Nevertheless, the court's use of a multiplier, without further elaboration, appears somewhat arbitrary. In this case, the multiplier of three yielded a figure considerably less than the amount sought by Laguerre and is within the range of the evidence before the court regarding the reasonableness of the fees. Yet, the order does not indicate why the court picked three. And, if three is appropriate, why not a multiplier of two, or five, or ten?

Though not binding on us, it is notable that federal courts limit the use of multipliers on the basis that "most, if not all," of the facts used to determine a reasonable fee are already subsumed in the lodestar, and it is not permissible to enhance a fee based on a factor that is subsumed. *Perdue v. Kenny A. ex rel. Winn*, 559 U. S. 542, 553 (III) (130 SCt 1662, 176 LE2d 494) (2010). That would be "double counting" — i e., a windfall. *City of Burlington v. Dague*, 505 U. S. 557, 563 (III) (112 SCt 2638, 120 LE2d 449) (1992). For example, the novelty and complexity of the issues are reflected in the number of hours spent on the case, as complicated

---

[1] The only Georgia case we found addressing the lodestar method declined to adopt it. See *Friedrich v. Fid. Nat. Bank*, 247 Ga. App. 704, 706-707 (545 SE2d 107) (2001) ("find[ing] persuasive . . . criticisms of the lodestar method" and adopting, for common-fund class action cases, a percentage of the fund analysis).

3

litigation will demand more time. *Blum v. Stenson*, 465 U. S. 886, 898-899 (III) (B) (104 SCt 1541, 79 LE2d 891) (1984). Similarly, the skill and experience of the attorneys will be reflected in the hourly rates. Id. As for the results obtained, this factor should be folded into the quality-of-representation factor. *Perdue*, 559 U. S. at 554 (IV) (B). This is so because the results obtained are relevant to attorney fees only if those results are attributable to counsel's performance, rather than, for example, mistakes by the other side or an unexpectedly sympathetic jury. Id. Finally, risk is not necessarily an appropriate basis for use of a multiplier as the difficulty of establishing the merits of the claim "is ordinarily reflected in the lodestar — either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. Taking account of it again through lodestar enhancement amounts to double counting." *Dague*, 505 U. S. at 562-563 (III) (citations and punctuation omitted). See also *Kennison v. Mayfield*, Case Nos. A20A2074, A20A2075__ Ga. App. __, __ (2) (c) (856 SE2d 738) (2021) (whole court) ("There is a distinction between the risk/reward bargain made between the client and his or her attorney and the actual value of the professional services rendered by the attorney.").

4

Based on the number of hours worked by Laguerre's counsel, evidence that a 40 percent contingency fee was usual and customary in a complex case such as here, and expert evidence that 40 percent was in fact reasonable given the specific circumstances of this case, we cannot say that the trial court abused its discretion in awarding $1,050,000 in attorney fees pursuant to OCGA § 9-11-68. Nevertheless, by affirming here, we are not condoning the unfettered use of multipliers. The trial court's discretion is bounded by statutory requirements that the fees awarded in all OCGA § 9-11-68 cases must be reasonable for the services performed. See *Ga. Dept. of Corrections v. Couch*, 295 Ga. 469, 483 (3) (a) (759 SE2d 804) (2014) ("It is well-settled that an award of attorney fees is to be determined upon evidence of the reasonable value of the professional services which underlie the claim for attorney fees.") (citation and punctuation omitted).